## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| MARYLOU ANDERSON, AUTUMN BLAZE, CALDER DUFFY, AND NASHERE MCGEE, on Behalf of Themselves and All Others Similarly Situated, | **Case No.:** |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | |
| RITE AID CORPORATION, | **<u>DEMAND FOR JURY TRIAL</u>** |
| Defendant. | |

Plaintiffs Marylou Anderson, Autumn Blaze, Calder Duffy, and Nashere McGee (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, by and through their undersigned counsel, bring this class action complaint against defendant Rite Aid Corporation (the "Defendant" or "Rite Aid"). Plaintiffs allege the following upon information and belief based on the investigation of counsel, except as to those allegations that specifically pertain to Plaintiffs, which are alleged upon personal knowledge.

### <u>NATURE OF THE ACTION</u>

1.      Rite Aid controls and operates https://riteaid.com/ (the "Website"). The Website provides users, such as Plaintiffs and Class Members, with access to various goods, including food, cosmetics, health-related goods, and prescription medications.  Using the Website, visitors can fill prescriptions (the "Rx Users"), purchase sensitive health-related goods (the "Purchasers"), and browse sensitive health-related goods (the "Browsers" and collectively with the Rx Users and Purchasers, the "Tracked Users").  The Website offers the option for Tracked Users to search for

goods which can be purchased from local Rite Aid store locations or purchased and delivered directly to the Visitor.

2.     To use the Website's search function (the "Search Bar"), Tracked Users type search queries or search terms (the "Queries") into the Search Bar to search for specific goods on the Website.  After typing and submitting Queries into the Search Bar, lists of results are obtained from the Website and displayed to its Tracked Users.

3.     Unbeknownst to Tracked Users, Rite Aid employs tracking tools on the Website which intercept communications between Tracked Users and the Website.  The tracking tools, which were created by Google and Meta (collectively referred to herein as the "Tracking Entities") send the Tracking Entities information relating to Tracked Users' searches on the Website.

4.     Further, when Tracked Users click on specific items on the Website, detailed descriptions of each item are shared with the Tracking Entities, and these details are shared *again* when Tracked Users add items to their carts.

5.     By sharing the items that Tracked Users search for, look at, and add to cart, Defendant shares protected private health information ("PHI") with the Tracking Entities.[1]

6.     The Website does not provide Tracked Users with notice that the Website's use of a Search Bar would cause their Queries to be shared with the Tracking Entities, that viewing items or adding items to a cart will result in detailed information about those items being intercepted by

---

[1] For example, Tracked Users may reveal symptoms, illnesses, health conditions, and family-planning status (*i.e.*, pregnancy) by using the Website to search for or purchase medical goods or prescriptions from the Website.

the Tracking Entities, or that such interceptions will be used to benefit the Defendant and Tracking Entities separate from the services being rendered to the Visitor.[2]

7.      Nor does Rite Aid obtain Tracked Users' consent to its disclosure practices prior to Tracked Users' use of the Website.

8.      Some tracking entities, such as Google, provide business tools to Rite Aid, which result in the tracking of Tracked Users' information to improve website functionality and developing a holistic profile of Tracked Users to improve the effectiveness of targeted advertising.

9.      Other tracking entities, such as Meta, improve the value of advertising by collecting and analyzing visitor data to determine interests, lifestyles, demographics, and other relevant categorizations to ensure relevant ads reach Tracked Users.  This value can be cashed out by using this information to sell advertising across multiple websites to marketing firms looking to target visitors based on their use of the Website or demographics.

10.     In short, the Tracking Entities receive a benefit by tracking more Visitor interactions on the Website.

11.     A data sharing policy for a website or online store is an important factor for individuals deciding whether to provide personal information to that website.

12.     Federal and Pennsylvania legislatures addressed citizens' privacy expectations when communicating with parties over wired communications.

13.     Congress passed the Wiretap Act, which prohibits the unauthorized interception of electronic communications.

---

[2] Interception of Visitors' communications with Defendant's Website will also be used outside of the Website by tracking entities to target Visitors with advertising sold to advertising purchasers, as discussed below.

14.     Pennsylvania passed the Wiretapping and Electronic Surveillance Control Act ("WESCA"), which attaches liability to any person who intercepts, discloses, uses or procures any other person to intercept, disclose or use electronic communications.[3]

15.     Rite Aid purposefully implemented and utilized various tracking tools on its Website, including Google's Retail API and advertising tools, and Facebook's Pixel.

16.     The Website does not obtain consent to share Tracked Users' Queries with third parties contemporaneously with Tracked Users' search requests.

17.     Rite Aid knew that the search feature used on the Website would feed Tracked Users' Queries to the Tracking Entities, and that the Website did not provide notice of or obtain consent as to such practices.

18.     Visitors of the Website who used the Search Bars have been harmed by Rite Aid, resulting in violations of WESCA and the Wiretap Act.  In addition to monetary damages, Plaintiffs seek injunctive relief requiring Rite Aid to immediately (i) remove the tracking tools from the Website, or (ii) add appropriate and conspicuous disclosures about the nature of its Search Bar, and obtain the appropriate consent from visitors.

19.     Plaintiffs also had their privacy interests violated.

20.     Visitors of the Website, such as Plaintiffs, have an interest in maintaining control over their private and sensitive information, such as their Queries, as well as an interest in preventing their misuse.

21.     Plaintiffs' claims are brought as a class action, pursuant to Federal Rule of Civil Procedure 23, on behalf of themselves and all other similarly situated persons.  Plaintiffs seek relief in this action individually and on behalf of Tracked Users for violations of WESCA, 18 Pa.

---

[3] 18 Pa. C.S.A. § 5725.

C.S.A. § 5701, *et seq*., breach of implied contract, breach of fiduciary duty, violation of Pennsylvania Unfair Trade Practices And Consumer Protection Law ("UTPCPL"), 73 P.S. §§ 201-1, and for violating the privacy rights of Plaintiffs and Tracked Users.

22.     Defendant violated the Plaintiffs and Tracked Users' privacy interests the moment, and each time, Plaintiffs and Tracked Users entered and submitted Queries via the Website's Search Bar and had their Queries intercepted by the tracking tools.

## PARTIES

23.     Plaintiff Marylou Anderson is a resident of Forest City, Pennsylvania. Throughout the past couple of years, Plaintiff Anderson visited Defendant's Website. Ms. Anderson recalls a specific instance in which she visited the Website in August 2023 on a computer.  During her visits to the Website, Ms. Anderson was not provided an opportunity to review or consent to share her personal information, or consent to the use of the tracking tools, or to the sharing of any of her personal information such as her statutorily protected health information. Plaintiff Anderson visited the Website to refill prescriptions using a Chrome browser on a device that was signed into Facebook resulting in Ms. Anderson's PHI being shared with Facebook. Ms. Anderson's Facebook profile included personally identifiable information.

24.     Plaintiff Autumn Blaze is a resident of Centre Hall, Pennsylvania. From 2022 to 2023, Ms. Blaze visited Defendant's Website on several different occasions throughout 2022 and 2023. During her visits to the Website, Ms. Blaze was not provided an opportunity to review or consent to share her personal information, or consent to the use of the tracking tools, or to the sharing of any of her personal information such as her statutorily protected health information. Ms. Blaze searched for various items on the Website, including over the counter medications, personal hygiene products, dietary supplements, added those items to her cart on the Website, and subsequently purchased those products through the Website. Ms. Blaze used a Safari and Chrome

browser on a device that was signed into Facebook, as recently as April 2023 resulting in Ms. Blaze's PHI being shared with Facebook. Ms. Blaze's Facebook profile included personally identifiable information.

25.     Plaintiff Calder Duffy is a resident of Philadelphia, Pennsylvania. Throughout the past couple of years, Mr. Duffy visited Defendant's Website on a mobile device and a computer. Mr. Duffy recalls a specific instance in which he visited the Website in the summer of 2023 on a computer. During his visits to the Website, Mr. Duffy was not provided an opportunity to review or consent to share his personal information, or consent to the use of the tracking tools, or to the sharing of any of his personal information such as his statutorily protected health information. Mr. Duffy searched for various items on the Website, including medication to treat health conditions, using a Safari browser on a device that was signed into Facebook, resulting in Mr. Duffy's PHI being shared with Facebook. Mr. Duffy additionally used the Website to refill his prescriptions and checked out or paid for those prescription medications through the Website. Mr. Duffy's Facebook profile included personally identifiable information.

26.     Plaintiff Nashere McGee is a resident of Philadelphia, Pennsylvania. Throughout the past couple of years, Mr. McGee visited Defendant's Website on a mobile device and a computer. Mr. McGee recalls a specific instance in which he visited the Website in May 2022 on a computer. During his visits to the Website, Mr. McGee was not provided an opportunity to review or consent to share his personal information, or consent to the use of the tracking tools, or to the sharing of any of his personal information such as his statutorily protected health information. Mr. McGee searched for various items on the Website, including medication for health conditions and personal hygiene products, and added those items to his cart on the Website, using a Chrome browser on a device that was signed into Facebook, resulting in Mr.

McGee's PHI being shared with Facebook. Mr. McGee additionally used the Website to refill his prescriptions following surgery and paid for those prescriptions through the Website.

27.     Defendant Rite Aid Corporation is incorporated in Delaware and headquartered in Philadelphia, Pennsylvania.  Rite Aid operates a "chain of retail drugstores in the United States" which sell prescription drugs, over-the-counter medications, health and beauty aids, personal care products, seasonal merchandise, cosmetics, household items, food, and a variety of other goods.[4]

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 Class Members; the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs; and at least one Class Member is a citizen of a state different from at least one Defendant.

29.     This Court has personal jurisdiction over Rite Aid because Rite Aid's principal place of business is in Pennsylvania and Rite Aid derives revenue in the State of Pennsylvania, including the Rite Aid's revenue generation from its management and operational control over the Website.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Rite Aid's place of business is located in this District and Rite Aid conducts substantial business operations in this District.

---

[4] *See Rite Aid Corporation (RAD)*, YAHOO! FINANCE
https://finance.yahoo.com/quote/RAD/profile/ (last accessed August 24, 2023).

## COMMON FACTUAL ALLEGATIONS

### A.   Legislative Background

#### a.  The Federal Wiretap Act

31.     The Federal Wiretap Act (the "Wiretap Act") was enacted in 1934 "as a response to Fourth Amendment concerns surrounding the unbridled practice of wiretapping to monitor telephonic communications."[5]

32.     The Wiretap Act primarily concerned the government's use of wiretaps, but was amended in 1986 through the Electronic Communications Privacy Act ("ECPA") to provide a private right of action for private intrusions as though they were government intrusions.[6]

33.     Congress was concerned that technological advancements were rendering the Wiretap Act out-of-date, such as "large-scale mail operations, computer-to-computer data transmissions, cellular and cordless telephones, paging devices, and video teleconferencing."[7]

34.     As a result, the ECPA primarily focused on two types of computer services which were prominent in the 1980s: (i) electronic communications such as email between users; and (ii) remote computing services such as cloud storage or third party processing of data and files.[8]

35.     Title I of the ECPA amended the Wiretap Act such that a violation occurs when a person or entity: (i) provides an electronic communication service to the public; and (ii) intentionally divulges the contents of any communication; (iii) while the communication is being

---

[5] Hayden Driscoll, *Wiretapping the Internet: Analyzing the Application of the Federal Wiretap Act's Party Exception Online*, WASHINGTON AND LEE JOURNAL OF CIVIL RIGHTS AND SOCIAL JUSTICE https://scholarlycommons.law.wlu.edu/cgi/viewcontent.cgi?article=1541&context=crsj (last visited August 24, 2023).
[6] *Id.* at 192.
[7] Senate Rep. No. 99-541, at 2 (1986).
[8] *In re Zynga Privacy Litig.*, 750 F.3d 1098, 1103 (9th Cir. 2014).

transmitted on that service; (iv) to any person or entity other than the intended recipient of such communication.

### b. Pennsylvania's Wiretapping and Electronic Surveillance Control Act

36.     WESCA was enacted in 1978 for the purpose "to protect the right of privacy of the people of [Pennsylvania]."[9]  The Pennsylvania legislators were concerned about emergent technologies that allowed for the "eavesdropping upon private communications," believing such technologies "created a serious threat to the free exercise of personal liabilities and cannot be tolerated in a free and civilized society."[10]

37.     WESCA is regularly recognized as Pennsylvania's analog to the Federal Wiretap Act, comprised of the same general elements and protect against the same general harms.

38.     To protect people's privacy, legislators broadly protected wired and aural communications being sent to or received from Pennsylvania.[11]  Notably, for wired communications, Pennsylvania set out to prohibit (i) intentional wiretapping or (ii) willful attempts to learn the contents of wired communications, (iii) attempts to use or transmit information obtained through wiretapping, or (vi) aiding, agreeing with, employing, or conspiring with any person(s) to unlawfully do, permit, or cause the preceding three wrongs.[12]

39.     WESCA also prohibits the manufacture, assembly, sale, offer for sale, advertisement for sale, possession, or furnishment to another of devices which are primarily or exclusively designed or intended for eavesdropping upon the communication of another.[13]

40.     WESCA claims are often treated as analogous to Wiretap Act claims.

---

[9] Cal. Penal Code § 630
[10] *Id.*
[11] Cal. Penal Code § 631-32.
[12] *Mastel v. Miniclip SA*, 549 F. Supp. 3d 1129, 1134 (E.D. Cal. 2021) (citing *Tavernetti v. Superior Ct.*, 22 Cal. 3d 187, 192 (1978)).
[13] Cal. Penal Code § 635.

B.    **How Websites (and the Internet) Operate**

41.     Websites are hosted on servers, but "run" on a user's internet browser.

42.     Websites are a collection of webpages, and each webpage is essentially a document containing text written in HyperText Markup Language (HTML) code.[14]

43.     Webpages each have a unique address, and two webpages cannot be stored at the same address.[15]

44.     When a user navigates to a webpage (such as entering a URL address directly or clicking a hyperlink containing the address), the browser contacts the DNS server, which translates the web address of that website into an IP address.[16]

45.     An IP (Internet Protocol) address is "a unique address that identifies a device on the internet or a local networks."[17] Essentially, an IP address is:

> the identifier that allows information to be sent between devices on a network: they contain location information and make devices accessible for communication. The internet needs a way to differentiate between different computers, routers, and websites. IP addresses provide a way of doing so and form an essential part of how the internet works.

46.     The user's browser then sends an HTTP Request to the server hosting that IP address via specific Request URL, requesting a copy of the webpage data for that Request URL

---

[14] *What is the difference between webpage, website, web server, and search engine?*, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Common_questions/Web_mechanics/Pages_sites_servers_and_search_engines (last visited August 24, 2023).

[15] *Id.*

[16] *How the web works*, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Getting_started_with_the_web/How_the_Web_works (last visited August 24, 2023).

[17] *What is an IP Address – Definition and Explanation*, KASPERSKY https://usa.kaspersky.com/resource-center/definitions/what-is-an-ip-address (last visited August 24, 2023).

be sent to the user, which, if approved, receives a HTTP Response that authorizes the HTTP Request and begins the process of sending the webpage's files to the user in small chunks.[18]

47.     This Request URL, includes a domain name and path, which indicates which content is being accessed on a website and where it is located.

48.     The Request URL also typically contains parameters.  Parameters are values added to a URL to transmit data to the recipient, usually indicated by the use of a question mark to signal the use of parameters, and direct a web server to provide additional context-sensitive services, as depicted below:



*Figure 1 – Mozilla's diagram of a URL, including parameters[19]*

49.     The user's browser then assembles the small chunks back into HTML, which is then processed by the user's browser and "rendered" into a visual display according to the instructions of the HTML code.[20]  This is the visible, and usually interactable, website that most people think of.

**C.     The Website Uses Google's Retail API for its Search Bar Functionality**

50.     Rite Aid makes use of the Google Retail API on its Website.

51.     The Retail API enables websites to catalog inventory and provide Search Bar functionality to visitors of the Website, including search personalization, search recommendations, search optimization, and visitor ID tracking.[21]

---

[18] *Id.*
[19] *What is a URL?*, MOZILLA https://developer.mozilla.org/en-US/docs/Learn/Common_questions/What_is_a_URL (last visited on August 24, 2023).
[20] *Id.*
[21] *Retail Search Requirements*, GOOGLECLOUD https://cloud.google.com/retail/docs/user-events#search-reqs (last visited August 24, 2023).

52.     The Website's Search Bar is a prominent feature on the site, as depicted below:



*Figure 2 - Picture of Rite Aid's Search Bar*

53.     The Search Bar appears to be a function operated by Rite Aid, with no indication that third parties would simultaneously intercept Tracked Users' Queries.  However, Queries are processed by Google's API, Doubleclick, Analytics, and Ads services.

54.     Notably, Google API's Terms of Service specifically puts API implementers on notice that that Google "makes no representations that the APIs satisfy HIPAA requirements" and that if a website is a "covered entity," as defined by HIPAA, it will not "use the APIs for any purpose or in any manner involving transmitting protected health information to Google" unless it has received prior written consent to such use from Google.

55.     The Search Bar allows visitors to search for goods sold by the Rite Aid on the Website, as depicted below:



56.    This Search Bar can be used to find mundane goods on the Website such as clothes and food, as well as medical goods such as contraception and disease treatments.

57.    Users care about who has their information and have a strong interest in limiting who may or may not access their communications with websites.  Sharing users' communications, Queries, and overall site activity is directly contrary to the privacy interests of website users, especially where sharing user information with one party will result in a chain reaction of data sharing with third-parties which users cannot anticipate.  This is precisely what happens when tracking entities obtain users' Queries.

58.    Once the Queries are entered into the Search Bar, Tracked Users lose their ability to control who has access to their Queries. Google then uses those Queries, as detailed below, to build profiles of Tracked Users and use that information to target Tracked Users with advertising

based on their profiles, causing the PHI to be shared with countless third parties, including advertising and marketing firms looking to develop effective advertising targeted at, or better-developed profile of, users.

59. Rite Aid conceals that Tracked Users' Queries were being collected, shared, and used without their knowledge.

60. Rite Aid did not disclose to Tracked Users that tracking entities were intercepting the Queries for functions unrelated to their use of the Search Bar. Specifically, the Queries are used for advertising, advertising sales and bidding, marketing profiles, and demographic databases.

61. The Queries are associated with Tracked Users after Google receives them, allowing Google to target Tracked Users across websites and domains beyond the Website.

62. After Queries are submitted to Google, advertisers purchasing ad space from Google can bid on search keywords, including Tracked Users' Queries, which causes targeted ads to appear for users resulting from their use of a search function.[22]

63. Google charges advertisers using various methods: cost-per-click or by setting a cost ceiling for a click.[23] During the auction process, Google decides which ads appear and in which positions on the search results page.[24]

64. Google further allows advertisers to target locations, languages, and audiences for its search results.[25]

---

[22] *How Google's $150 billion advertising business works*, CNBC
https://www.cnbc.com/2021/05/18/how-does-google-make-money-advertising-business-breakdown-.html (last visited August 24, 2023).
[23] *Id.*
[24] *Id.*
[25] *Id.*

65.     Google also processes this data to improve its search algorithms, on the Website and beyond.   Specifically, the higher volume of Queries obtained, the more accurate some services become, such as search personalization, search recommendations, search optimization, and user tracking.

66.     This is reflected through Google's Search Performance tiers.[26]

67.     In short, Tracked Users to the Website expect that they are communicating directly with Rite Aid.   Instead, however, users of the Website have the communications they directed to the Website intercepted, collected, read by the Tracking Entities.

68.     Rite Aid chose to monetize the search results provided by the Search Bar, even where it relates to PHI, as well as sharing the Queries with Tracking Entities.

69.     Rite Aid profits separately from the marketing, with Rite Aid receiving a percentage of the advertising revenue earned by advertising on the Website.

**D.     Plaintiffs Have a Privacy Right in Their Queries**

70.     Companies can easily build profiles of customers based on their consumer habits.

71.     Communications shared between consumers and companies, by and through their websites and mobile apps, appear to be private but, in reality, the contents of those messages are regularly, without notice, shared with third parties.

72.     Here, Rite Aid share users' information, including Queries, with the Tracking Entities.

73.     Queries are inherently private.   This is particularly true when the searches are communicated in confidence or presumed to be private.   All Queries are personal in nature, but

---

[26] *Unlock search performance tiers*, GOOGLECLOUD https://cloud.google.com/retail/docs/data-quality (last visited August 24, 2023).

there is an obviously heightened want for the searches to be kept confidential when the Queries themselves contain private health information.

74.     As described in paragraphs 141 through 146, descriptions and summaries of medical products and Queries are private information worthy of federal protection.

75.     Tracked Users search for, look at, and purchase medical products from the Website using Queries, by viewing medical product webpages, and adding those medical products to their cart.  The Queries, when associated with descriptions of the products, pertain to more than users' basic privacy.

76.     This private information is then shared with various advertising services, including Google and Meta.

**E.     Tracking Entities Utilize Tracking Tools to Benefit From Users' Queries**

77.     As described in paragraphs 153 through 161, the Website does not notify Tracked Users that their Queries will be surreptitiously intercepted when conducting a search on the Website. There is no conspicuous notice near the Search Bar that would let Tracked Users know that their searches were being tracked, stored, shared, and sold.

78.     The Website's use of the Tracking Entities' tracking tools in Rite Aid's implementation of the Search Bar provides benefits to the Tracking Entities that is separate and in addition to the benefit to the Website.

**a.   The Website Utilizes Google's Ad Products to monetize users' Queries**

79.     Recent data shows that Google's largest source of revenue comes from Google search ads – a Google product called Google Ads (formerly AdWords), which accounted for $162.45 billion of Google's $279.81 billion of revenue in 2022.[27] As recently as 2020, almost 80

---

[27] *How Does Google Make Money?*, OBERLO https://www.oberlo.com/statistics/how-does-google-make-

percent of Alphabet's revenue, Google's parent company, came from Google ad related products.[28] Google collects 30 cents for every dollar that advertisers spend through its various tools across the internet.[29]  Google is the global leader in advertising revenue generation worldwide[30], surpassing both Facebook and Amazon.

80.     Users care about who has their information and have a strong interest in limiting who may or may not access their communications with websites.  Sharing users' communications, Queries, and overall site activity is directly contrary to the privacy interests of website users, especially where sharing user information with one party will result in a chain reaction of data sharing with third-parties which users cannot anticipate.  This is precisely what happens when tracking entities obtain users' Queries.

81.     Once the Queries are entered into the Search Bar, Tracked Users lose their ability to control who has access to their Queries. Google then uses those Queries, as detailed below, to build profiles of Tracked Users and use that information to target Tracked Users with advertising based on their profiles, causing the PHI to be shared with countless third parties, including advertising and marketing firms looking to develop effective advertising targeted at, or better-developed profile of, users.

---

money#:~:text=Google%20revenue%20breakdown%3A%20top%20five,billion%20came%20from%20search%20ads (last visited August 24, 2023).

[28] *How Google's $150 billion advertising business works*, CNBC
https://www.cnbc.com/2021/05/18/how-does-google-make-money-advertising-business-breakdown-.html (last visited August 24, 2023).

[29] *Google accused of monopolizing $250B U.S. digital ad market*, POLITICO
https://www.politico.com/news/2023/01/24/new-doj-lawsuit-could-break-up-google-00079229 (last visited August 24, 2023).

[30] *Advertising revenue of major digital ad-selling companies worldwide in 2022*, STATISTA
https://www.statista.com/statistics/1202672/digital-ad-revenue-ad-selling-companies-worldwide/#:~:text=Ad%20revenue%20of%20major%20digital%20ad%20sellers%20worldwide%202022&text=In%202022%2C%20Google%20was%20forecast,leading%20digital%20ad%20sellers%20worldwide (last visited August 24, 2023).

82.     Rite Aid conceals that Tracked Users' Queries were being collected, shared, and used without their knowledge.

83.     Rite Aid did not disclose to Tracked Users that tracking entities were intercepting the Queries for functions unrelated to their use of the Search Bar.  Specifically, the Queries are used for advertising, advertising sales and bidding, marketing profiles, and demographic databases.

84.     The Queries are associated with Tracked Users after Google receives them, allowing Google to target Tracked Users across websites and domains beyond the Website.

85.     After Queries are submitted to Google, advertisers purchasing ad space from Google can bid on search keywords, including Tracked Users' Queries, which causes targeted ads to appear for users resulting from their use of a search function.[31]

86.     Google charges advertisers using various methods: cost-per-click or by setting a cost ceiling for a click.[32]  During the auction process, Google decides which ads appear and in which positions on the search results page.[33]

87.     Google further allows advertisers to target locations, languages, and audiences for its search results.[34]

88.     Google also processes this data to improve its search algorithms, on the Website and beyond.  Specifically, the higher volume of Queries obtained, the more accurate some services become, such as search personalization, search recommendations, search optimization, and user tracking.

---

[31] *How Google's $150 billion advertising business works*, CNBC
https://www.cnbc.com/2021/05/18/how-does-google-make-money-advertising-business-
breakdown-.html (last visited August 24, 2023).
[32] *Id.*
[33] *Id.*
[34] *Id.*

89.     This is reflected through Google's Search Performance tiers.[35]

90.     In short, Tracked Users to the Website expect that they are communicating directly with Rite Aid.  Instead, however, users of the Website have the communications they directed to the Website intercepted, collected, read by the Tracking Entities.

91.     Rite Aid chose to utilize tools made available by the Tracking Entities through its Search Bar to gather information about its Tracked Users, resulting in the sharing of Queries with the Tracking Entities.

### i.      Google DoubleClick

92.     DoubleClick Digital Marketing ("DoubleClick") is an expansive tool that helps analyze traffic and report on the effectiveness of advertising, tracks bids to sell digital advertising space, helps websites create, manage, report on, and optimize search campaigns, helps websites create and manage advertisements, and feeds information into Google's Analytics tool to create holistic profiles of website visitors.[36]

93.     DoubleClick will then tailor ads to users by using their search terms, demographic data, and customer status.[37]

94.     The process for DoubleClick works as follows: (i) a website operator signs up for the platform by creating a Google Ad Manager account;[38] (ii) a third-party advertiser then creates an ad campaign using Google AdWords, which includes ad creatives, targeting options, and bid

---

[35] *Unlock search performance tiers*, GOOGLECLOUD https://cloud.google.com/retail/docs/data-quality (last visited August 24, 2023).
[36] *DoubleClick Digital Marketing*, GOOGLE HELP
https://support.google.com/faqs/answer/2727482?hl=en (last visited August 24, 2023).
[37] *Search Ads 360*, GOOGLE MARKETING PLATFORM
https://marketingplatform.google.com/about/search-ads-360/features/ (last visited August 24, 2023).
[38] *DoubleClick for Publishers: Everything You Need to Know*, PUBLIFT
https://www.publift.com/blog/what-is-googles-dfp-first-look (last visited August 24, 2023).

strategies; (iii) the advertiser then submits the ad to DoubleClick where it is reviewed and approved;[39] (iv) once approved, the website owner can put the ad on the DoubleClick Ad Exchange to find a buyer for the ad space.[40]

95.    Additionally, DoubleClick tracks the performance of ads and provides data such as impressions, clicks, and conversions to the advertiser. That information is then used to further optimize advertising campaigns. The DoubleClick's ad server uses targeting and bidding algorithms to determine which ad to display, based on factors such as the user's location, browsing history, and interest. [41]

96.    Rite Aid sends this information, including Tracked Users' Queries, to Google via the URL doubleclick.net as depicted below:

---

[39] *Support: Creating ads on your website with Google DoubleClick for Publishers*, HOCKEYTECH https://support.hockeytech.com/portal/en/kb/articles/creating-ads-on-your-website-with-google-doubleclick-for-publishers (last visited August 24, 2023).
[40] *DFP Glossary: An Easier Explanation for All the Jargon – How Does DoubleClick DFP Work?*, ADPUSHUP https://www.adpushup.com/blog/google-dfp-doubleclick-for-publishers/#How_Does_DoubleClick_DFP_Work (last visited August 24, 2023).
[41] *DoubleClick (Google): What is it and what does it do?*, THE GUARDIAN https://www.theguardian.com/technology/2012/apr/23/doubleclick-tracking-trackers-cookies-web-monitoring (last visited August 24, 2023).



*Figure 3 - Using Trojans' Search Bar results in Doubleclick intercepting and obtaining Queries*

97.     Google aggregates data on what users are clicking on the website owner's sites to further improve their algorithms, develop their own products, and further drive revenue. [42]

98.     Rite Aid chose to integrate DoubleClick into the Website to further monetize, or otherwise obtain value from, Tracked Users' use of the website. The Website receives valuable data from users, which helps third-party websites sell advertising or improves search results on the Website, thus, directly benefiting from the DoubleClick implementation.

### iii.     Google Tags, and Tag Manager

99.     Rite Aid also makes use of the Google Tag Manager system.

100.    Google Tags enable websites to send data to linked Google product destinations (such as Google Analytics or Google Ads accounts) to help measure website and advertising effectiveness. [43]   The data sent from Google Tags are accessible and configurable from Google Ads and Google Analytics. [44]

---

[42] *What Does Google Do With Your Data?*, AVAST https://www.avast.com/c-how-google-uses-your-data (last visited August 24, 2023).
[43] *Tag Manager Help: About the Google tag*, GOOGLE https://support.google.com/tagmanager/answer/11994839?hl=en (last visited August 24, 2023).
[44] *Id.*

101.    Website developers can use Google Tag IDs ("GID") to add Google Tags with specific Google products and services associated with the GID to websites.[45]  GIDs often include the prefixes GT-XXXXXX, G-XXXXXX, and AW-XXXXXX.[46]

102.    A single Google Tag can reference multiple GIDs.[47]  A single Google Tag can also be used to send data to multiple "destinations."[48]

103.    Google defines "destinations" as Google measurement product accounts that share configuration setting with and receive data from Google Tags.[49]  Currently, only Google Ads accounts and Google Analytics properties can be destinations for the data sent by tags.[50]

104.    Destinations can be added to a Google Tag to reuse the Tag's settings and simplify adding the Tag across multiple webpages.[51]

105.    Similarly, destination IDs are used as identifiers to represent the destination of data sent by the Google Tag.[52]  The Google Tag uses destination IDs to "load destination-specific settings and to route events."[53]

106.    Like the Facebook Pixel, Google Tags collect data about user interactions with a website, including: link clicks, button clicks, form submissions, conversions, shopping cart

---

[45] *Id.*

[46] *Tag Manager Help: Google tag ID: Definition*, GOOGLE
https://support.google.com/tagmanager/answer/12326985?hl=en&ref_topic=12403939&sjid=14
124967584070639073-NA (last visited August 24, 2023).

[47] *Id.*

[48] *Id.*

[49] *Tag Manager Help: Destination: Definition*, GOOGLE
https://support.google.com/tagmanager/answer/12324388?hl=en&ref_topic=12403939&sjid=14
124967584070639073-NA (last visited August 24, 2023).

[50] *Id.*

[51] *Id.*

[52] *Tag Manager Help: Google tag ID: Definition*, GOOGLE
https://support.google.com/tagmanager/answer/12326985?hl=en&ref_topic=12403939&sjid=14
124967584070639073-NA (last visited August 24, 2023).

[53] *Id.*

abandonment, adding items to carts, removing items from carts, file downloads, scrolling behavior, video views, call to action performance, table of contents clicks, and other customizable events.[54]

107.    The data collected by GIDs are sent to specific destinations associated with the GIDs.[55]  Notably, Google notifies web developers that developers should provide "users with clear and comprehensive information about the data . . . collect[ed] on [their] websites" and to obtain "consent for that collection where legally required."[56]

108.    In short, the GIDs represent specific data collection practices and settings and pre-determined destinations for that data.  Google itself is aware of the potential legal violations its data collection tools are capable of, and puts the onus onto the website developers, such as Rite Aid.

109.    Here, Rite Aid added a number of Google Tags to the Webpage.

110.    Rite Aid uniformly includes two or more GIDs on each Webpage.

111.    The Website contains multiple GIDs: GTM-NZG6W9, G-6P7R43MWGH, and UA-1427291-1.

112.    Each of the individual GIDs represents a different communication to Google.

113.    On the Website, the Queries are collected by the UA-1427291-1 tag and sent to Google Doubleclick, as depicted by the example taken directly from the Website below:

---

[54] Zach Paruch, *What Is Google Tag Manager & How Does It Work?*, SEMRUSH: BLOG (Feb. 21, 2023) https://www.semrush.com/blog/beginners-guide-to-google-tag-manager/ (last visited August 24, 2023).
[55] *Tag Manager Help: About the Google Tag*, GOOGLE
https://support.google.com/tagmanager/answer/11994839?hl=en (last visited August 24, 2023).
[56] *Id.*



114.   Similarly, on the Website, the Queries are separately collected by the UA-1427291-1 and GTM-NZG6W9 tags and sent to Google Analytics, as depicted by the example taken directly from the Website below:



**b. Rite Aid utilized Meta's Pixel to monetize Tracked Users' Queries and Webpage Interactions**

115.     Facebook offers the Facebook Pixel, also known as the Meta Pixel (the "Pixel"), to web developers for the purpose of monitoring user interactions on their websites, which can then be shared with Facebook.

116.     The Pixel is a marketing tool that can only be purposely added by website developers to a website.  A website operator must link a related Facebook account with its Pixel, and then add code to each webpage on the website to make use of the Pixel.[57]

117.     Rite Aid effectuated the steps to add the Pixel to the Website.

118.     The Pixel is employed by website operators to gather, collect, and then share user information with Facebook.[58]  Receiving this information enables Facebook and the web developers to build valuable personal profiles for users, enhancing marketing effectiveness and increasing the chance of converting users into paying customers.[59]

119.     Web developers and website operators can choose to use the Pixel to share both user activity and user identity with Facebook.  Here, the Website shares both.

120.     The owner or operator of a website holds the decision-making authority over the placement of the Pixel on its site, including which webpages the pixel should be added to, which events should be monitored, and what information is disclosed, including whether such

---

[57] *How to set up and install a Meta Pixel*, FACEBOOK
https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited on August 24, 2023).
[58] The Facebook Pixel allows websites to track visitor activity by monitoring user actions ("events") that websites want tracked and share a tracked user's data with Facebook. *See Meta Pixel*, FACEBOOK  https://developers.facebook.com/docs/meta-pixel/ (last visited on August 24, 2023).
[59] *See Meta Pixel*, FACEBOOK https://www.facebook.com/business/tools/meta-pixel (last visited on August 24, 2023).

information is concealed using a "hash."[60]

### i.     The Website Implemented the Pixel

121.    To activate and employ a Facebook Pixel, a website owner must first sign up for a Facebook account, where specific "business manager" accounts are provided the most utility for using the Pixel.[61]   For instance, business manager accounts can: (i) create and utilize more simultaneous Pixels, (ii) manage multiple Facebook Ad Accounts and Pages from a centralized interface, (iii) access and manage multiple parties (which can then be given specific levels of access, including more easily revoking access to ex-employees), (iv) build custom audiences for multiple ad campaigns, and (v) eliminate privacy concerns related to using a personal profile for business purposes.[62]

122.    To add an operational Pixel to a website, website operators take several affirmative steps, including naming the Pixel during the creation and setup of the Pixel.[63]

---

[60] Hashing takes values of various lengths and converts them to a fixed-length value (based on number of characters), and in this process encrypts the data. *See Hash,* MOZILLA https://developer.mozilla.org/en-US/docs/Glossary/Hash (last visited August 24, 2023).
[61] *How to create a Meta Pixel in Business Manager*, FACEBOOK https://www.facebook.com/business/help/314143995668266?id=1205376682832142 (last visited on August 24, 2023).
[62] Jacqueline Zote, *A step-by-step guide on how to use Facebook Business Manager* (June 14, 2021), SPROUTSOCIAL https://sproutsocial.com/insights/facebook-business-manager/ (last visited on August 24, 2023).
[63] *Id.; see also* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YOUTUBE https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited August 24, 2023).

123.    Once the Pixel is created, the website operator assigns access to the Pixel to specific people for management purposes,[64] as well as connect the Pixel to a Facebook Ad account.[65]

124.    To add the Pixel to its website, the website operator can choose to add the Pixel code through the "event setup tool" via "partner integration" or by manually adding the code to the website.

125.    Manually adding base Pixel code to the website consists of a multi-step process, which includes: (i) creating the pixel; (ii) installing base code in the header of every webpage the Pixel is active, (iii) setting automatic advanced matching behavior, (iv) adding event code using an automated tool or manually,[66] (v) domain verification, and (vi) configuring web events.[67]

126.    After following these steps, a website operator can start harvesting information using the Pixel.

127.    A Pixel cannot be placed on a website by a third-party without being given access by the site's owner.

128.    Once the Pixel is operational, it can begin collecting and sharing user activity data as instructed by the website developers.

---

[64] *Add People to Your Meta Pixel in Your Meta Business Manager*, FACEBOOK https://www.facebook.com/business/help/279059996069252?id=2042840805783715 (last visited on August 24, 2023).
[65] *Add an ad account to a Meta Pixel in Meta Business Manager*, FACEBOOK https://www.facebook.com/business/help/622772416185967 (last visited on August 24, 2023).
[66] Some users claim that automated tools for adding event code provide inconsistent results and recommend adding event code manually.  *See* Ivan Mana, *How to Set Up & Install the Facebook Pixel (In 2022)*, YOUTUBE https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited on August 24, 2023).
[67] *How to set up and install a Meta Pixel*, FACEBOOK https://www.facebook.com/business/help/952192354843755?id=1205376682832142 (last visited on August 24, 2023); *see* Ivan Mana, *How to Set Up & Install the Facebook Pixel (in 2022)*, YOUTUBE https://www.youtube.com/watch?v=ynTNs5FAUm8 (last visited on August 24, 2023).

129.     When a Facebook user logs onto Facebook, a "c_user" cookie – which contains a user's non-encrypted Facebook User ID number ("UID") – is automatically created and stored on the user's device for up to a year.[68]

130.     A Facebook UID can be used, by anyone, to easily identify a Facebook user.

131.     Any person, even without in-depth technical expertise, can utilize the UID to identify owners of the UID via their Facebook profile. Once the Pixel's routine exchange of information is complete, the UID that becomes available can be used by any individual of ordinary skill and technical proficiency to easily identify a Facebook user, by simply appending the Facebook UID to www.facebook.com (e.g., www.facebook.com/[UID_here]).  That step, readily available through any internet browser, will direct the browser to the profile page, and all the information contained in or associated with the profile page, for the user associated with the particular UID.

### ii.        The Pixel as a Tracking Tool

132.     The Pixel tracks user-activity on web pages by monitoring events which,[69] when triggered, causes the Pixel to automatically send data directly to Facebook.[70]

133.     Examples of events utilized by websites include: a user loading a webpage with (i) a specific product (the "ViewContent" event"),[71] (ii) with a Pixel installed (the "PageView

---

[68] *Cookies & other storage technologies*, FACEBOOK https://www.facebook.com/policy/cookies/ (last visited on August 24, 2023).
[69] *Meta Business Help Center: About Meta Pixel*, FACEBOOK https://www.facebook.com/business/help/742478679120153?id=1205376682832142 (last visited on August 24, 2023).
[70] *See generally Id.*
[71] *Facebook Microdata Installing Schema*, CAT HOWELL https://cathowell.com/facebook-microdata-what-it-is-how-to-set-it-up/ (last visited on August 24, 2023).

event"), or (iii) when an item is added to a Tracked Users' cart (the "AddToCart" event, collectively, the "Pixel Events").[72]  The Website utilizes the Pixel Events.[73]

134.   When a Pixel Event is triggered, an "HTTP Request" is sent to Facebook (through Facebook's URL www.facebook.com/tr/).[74]

135.   The HTTP Request includes a Request URL and embedded cookies such as the c_user cookie.  It may also include information in its Payload,[75] such as metadata tags, or it may contain a "parsed" version of the Request URL.[76]

### iii.        The Pixel Shares Tracked Users' Website Interactions

136.   When a Pixel event triggers, the parameters included in a Request URL provide websites and Facebook with additional information about the event being triggered.[77]

---

[72] *Meta for Developers: Reference - standard events*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/reference/ (last visited on August 24, 2023).

[73] The presence of Pixel events, such as the ViewContent, PageView, and AddToCart events, can be confirmed by using the publicly available and free Meta Pixel Helper tool.  *See About the Meta Pixel Helper*, FACEBOOK https://www.facebook.com/business/help/198406697184603?id=1205376682832142 (last visited on August 24, 2023).

[74] *How We Built a Meta Pixel Inspector*, THE MARKUP https://themarkup.org/show-your-work/2022/04/28/how-we-built-a-meta-pixel-inspector (last visited on August 24, 2023).

[75] The "request payload" (or more simply, "Payload") is data sent by a HTTP Request, normally through a POST or PUT request, where the HTTP Request has a distinct message body.  Payloads typically transmit form data, image data, and programming data.  *See Request Payload Variation,* SITESPECT *https://doc.sitespect.com/knowledge/request-payload-trigger (last visited August 24, 2023).*

[76] Data in request headers and payload headers is often unreadable and unstructured, which is why internet browsers and other software "convert data into a more readable and organized format, helping to extract relevant information while investing minimal time in interpreting a data set.  *See What is Data Parsing?*, TIBCO https://www.tibco.com/reference-center/what-is-data-parsing#:~:text=Data%20parsing%20is%20converting%20data,challenging%20to%20read%20and%20comprehend (last visited August 24, 2023).

[77] *Meta for Developers: Conversion Tracking*, FACEBOOK https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking/ (last visited on August 24, 2023).

137.    The URL's path contains information about user activity, such as which content is searched for or watched, in addition to the parameters.

138.    By way of example, the following screenshots depicts how the URL path mirrors the name of the product being viewed on the Website and how parameters are used to share Queries:



*Figure 4 - Rite Aid website uses URL path to convey product information[78]*

---

[78] *Neutrogena Stubborn Acne Hydrocolloid Blemish Patches – 24 ct*, RITEAID
https://www.riteaid.com/shop/neutrogena-stubborn-acne-hydrocolloid-blemish-patches-24-ct
(last visited August 24, 2023).



*Figure 5 - Search query appears in URL as parameter*

139.    The parameters for a Request URL may include the category or name of a product being searched for, depending on what terms a Visitor uses in the Search Bar.

140.    The ViewContent and AddToCart events, by default, includes properties which can be assigned by website operators to include various types of information: content_id, content_category, content_name, content_type, contents, currency, and value.

141.    Rite Aid assigns descriptive information to those properties, including product name, price, the quantity being purchased, internal id number, and the currency being used to make the purchase, as depicted below:

id: 1264059003707256
ev: ViewContent
dl: https://www.riteaid.com
rl: https://www.riteaid.com
if: false
ts: 1692172480506
cd[content_name]: Neutrogena Stubborn Acne Hydrocolloid Blemish Patches - 24 ct
cd[content_ids]: 2202031
cd[content_type]: product
cd[value]: 10.99
cd[currency]: USD
cd[contents]: [{"id":"2202031","quantity":1,"item_price":"10.99","content_typ
e":"product","content_name":"Neutrogena Stubborn Acne Hydrocolloid Blemish Patch
es - 24 ct"}]
sw: 1920

*Figure 6 - ViewContent event firing, including product name and description in Request URL[79]*

142.   ViewContent events are triggered whenever a product's specific web page is loaded.

143.   When a ViewContent event is triggered, it sends a request to Facebook containing data, including, but not limited to, its properties, as depicted above in Figure 6.

144.   When a "c_user" cookie is in place, the Pixel Events' requests include users' c_user cookies by copying the c_user cookie into the Request Header, as depicted below:

---

[79] *Id.*

em_price%22%3A%2210.99%22%2C%22content_type%22%3A%22product%22%2C%22content_na
me%22%3A%22Neutrogena%20Stubborn%20Acne%20Hydrocolloid%20Blemish%20Patches%20-
%2024%20ct%22%7D%5D&sw=1536&sh=864&v=next&r=canary&ec=1&o=28&ttf=5589.2000002
86102&tts=4815.400000095367&ttse=4891.800000190735&fbp=fb.1.1691701254433.4061263&eid
=ob3_plugin-
set_4de708a3cd5769b5c377a079e36db2efec3e8a0acb2f0b71ad0f62e994ad1150&pm=1&hrl=56c64
d&it=1691702559489&coo=false&dpo=LDU&dpoco=0&dpost=0&cs_cc=1&cas=71354283198230
18%2C6591451704247650%2C6187291048034838%2C6747812445231266%2C6246026182185671%
2C6500726859947885%2C6507395649313313%2C6261505623937710%2C6397805190285766%2C5
963154233722702%2C5413282555420848%2C5755585437799656%2C4751021695019800%2C4337
283659617902%2C4634316570021786%2C3969738999804995%2C3719046188215353%2C3799459
376779039%2C1724974574279000&exp=a1&rqm=GET

| :scheme: | https |
|---|---|
| Accept: | image/avif,image/webp,image/apng,image/svg+xml,image/*,*/*;q=0.8 |
| Accept-Encoding: | gzip, deflate, br |
| Accept-Language: | en-US,en;q=0.9 |
| Cookie: | sb=sATZYyHbM_JpCBYKkdn1MuNp; datr=sATZYwA65eCj6xEiM9LWCfHd; c_user=<br>xs=20%3AnG2kFBJxeuH_gw%3A2%3A1690820745%3A-<br>1%3A8146%3A%3AAcVdGMOk3OvZA7i5Wx39oDaPeQF4J4YYH_UkUDTeQil; |

*Figure 7 - Embedded c_user cookie in Pixel Request transmitted to Facebook[80]*

145.    The AddToCart Pixel Event sends identical data to Rite Aid when the item is

added to a cart, as depicted below:

---



*Figure 8 - Embedded c_user cookie in Pixel Request transmitted to Facebook[81]*

146.    The Pixel Events, when triggered, independently and automatically result in the sharing of a user's website interactions (including PHI) and Facebook UID with Facebook.

147.    Thus, PHI of Plaintiffs and the Class Members have automatically been shared with Facebook as a result of Rite Aid's decision to add the Pixel to the Website.

148.    As described above, the Pixel captures information on the Website and sends that information to Meta through triggered Pixel Events.

---

[81] *Id.*

149.   The Pixel passed this information through the HTTP Requests sent to facebook.com/tr.

150.   The Pixel intercepted and shared PHI related to medical products sought by, viewed by, and added to cart by Plaintiffs, as depicted above from paragraph 140 to paragraph 146.

151.   The Pixel is active across the Website, including medical product pages, as implemented by Rite Aid.

152.   When a Visitor views or interacts with those medical products on the Website, those actions are intercepted and monetized by the Tracking Entities.

**F.   Plaintiffs Did Not Consent to Defendant's Sharing of Plaintiffs' Website Activity**

153.   Plaintiffs and Class members were unaware of the tracking tools intercepting their confidential communications with the Website.

154.   Plaintiffs and Class members reasonably believed that communications to the Website were made in confidence and that they would not be shared with third parties.

155.   With no notice or warning as to who was intercepting and decoding the contents of their communications, Plaintiffs were not provided notice of or given an opportunity to provide consent to the tracking tools' interception of Plaintiffs' Queries, webpage interactions, and/or cart activity.

156.   Facebook and Google guide and caution website operators of the dangers of using their tracking tools without first providing notice of and then obtaining valid consent for invasively collecting Plaintiffs' protected data and either making that data available to third-parties or allowing third parties to intercept Plaintiffs' protected information.  Rite Aid agreed to these terms, directly or as the effective owner of the Website, in order to utilize and employ the tracking tools.

157.     For example, to use Meta's Facebook Pixel, the owner or operator of the website must accept Meta's Commercial Terms and Business Tools Terms.  Meta explicitly states that the employment of the Pixel will result in data sharing, including with Meta[82] through the automatic sharing of Pixel Event information and contact information.  *Id.*  Meta directs parties implementing the Pixel – here, Rite Aid – to encrypt request information[83] *before* data can be shared.  *Id.*  Meta even provides Pixel implementers guidance on responsible data handling, which explains how data is acquired, used, and stored, including which information is shared with Meta. More significantly, Meta instructs Pixel users to ensure the acquisition of any rights, permissions, or consents, before sharing information with any third-party.[84]

158.     Similarly, Google requires that websites implementing Google's tracking tools warrant to Google that the websites will not violate local, state, or federal laws.[85]

159.     Google requires that websites implementing Google Analytics "disclose the use of Google Analytics and how it collects and processes data."[86]  Google's Analytics terms also

---

[82] *Meta Business Tools Terms*, FACEBOOK https://www.facebook.com/legal/terms/businesstools?paipv=0&eav=AfakosFmNyhZJOrkCsGod nMzth_uq6s403DsPEkeiKEyrj7rKyf5_t2I8wFEEUZUJII&_rdr (last visited August 24, 2023).

[83] This contrasts with Facebook's JavaScript Pixel, which automatically encrypts the data being sent.  Lee has specifically chosen the Pixel method which makes users' information visible.  *See Id.*

[84] *Best Practices for Privacy and Data Use for Meta Business Tools*, FACEBOOK https://www.facebook.com/business/help/363303621411154?id=818859032317965 (last visited August 24, 2023).

[85] *Programmable Search Engine Help: Programmable Search Engine Terms of Service*, GOOGLE https://support.google.com/programmable-search/answer/1714300?hl=en (last visited August 24, 2023); *see also Privacy & Terms,* GOOGLE https://policies.google.com/terms (last visited August 24, 2023).

[86] *Analytics Help: Privacy Disclosures Policy*, GOOGLE https://support.google.com/analytics/answer/7318509?hl=en&ref_topic=1008008 (last visited August 24, 2023).

require websites to "inform users about the information being stored and give them the opportunity to grant or deny their consent."[87]

160.    In contravention to Meta's and Google's terms and guidance, Plaintiffs were not given notice of the use of the tracking tools on the Website, including Meta's and Google's tracking products and services.

161.    As a result, Plaintiffs did not and could not provide consent to the collection and sharing of their data when communicating Queries to the Website, viewing products on the Website, or adding items to their digital carts on the Website.

## TOLLING

162.    The statutes of limitations applicable to Plaintiffs' and the Classes' claims were tolled by Rite Aid's conduct and Plaintiffs' and Class Members' delayed discovery of their claims.

163.    As alleged above, Plaintiffs and members of the Classes did not know and could not have known when they used the Website that Rite Aid was disclosing their information and communications to third parties. Plaintiffs and members of the Classes could not have discovered Rite Aid's unlawful conduct with reasonable diligence.

164.    Rite Aid secretly incorporated the Tracking Entities' tracking tools into the Website, providing no indication to Tracked Users that their communications would be disclosed to these third parties.

165.    Rite Aid had exclusive and superior knowledge that the Tracking Entities' tracking tools incorporated on its Website would disclose Tracked Users' protected and private information and confidential communications, yet failed to disclose to Tracked Users that by

---

[87] *Analytics Help: Safeguarding your data*, GOOGLE https://support.google.com/analytics/answer/6004245?hl=en (last visited August 24, 2023).

interacting with the Website that Plaintiffs' and Class Members' Queries, PHI, and website interactions would be disclosed to third parties.

166.    Plaintiffs and Members of the Classes could not with due diligence have discovered the full scope of Rite Aid's conduct because the incorporation of the Tracking Entities' tracking tools is highly technical and there were no disclosures or other indication that would inform a reasonable consumer that Rite Aid was disclosing and allowing the interception of such information to these third parties.

167.    The earliest Plaintiffs and Class Members could have known about Rite Aid's conduct was in connection with their investigation and the work done on their behalf in preparation of filing of this Complaint.

## CLASS ACTION ALLEGATIONS

168.    Plaintiffs bring this action individually and on behalf of the following Classes:

Nationwide Class of Tracked Users: All persons in the United States whose searches and activity on the Website were intercepted, stored, and shared through the use of tracking tools (the "Nationwide Class").

Pennsylvania Subclass of Tracked Users: All persons residing in Pennsylvania whose communications with the Website were intercepted, stored, and shared through the use of tracking tools (the "Pennsylvania Subclass").

169.    Specifically excluded from the Classes are Defendant, its officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, joint venturers, or entities controlled by Defendant, and its heirs, successors, assigns, or other persons or entities related to or affiliated with Defendant and/or its officers and/or directors, the judge assigned to this action, and any member of the judge's immediate family.

170.    Plaintiffs reserve the right to amend the Class definitions above if further investigation and/or discovery reveals that the Classes should be expanded, narrowed, divided into additional subclasses, or otherwise modified in any way.

171.    This action may be certified as a class action under Federal Rule of Civil Procedure 23 because it satisfies the numerosity, commonality, typicality, adequacy, and superiority requirements therein.

172.    Numerosity (Rule 23(a)(1)): At this time, Plaintiffs do not know the exact number of members of the aforementioned Class. However, given the popularity of Rite Aid's Website, the number of persons within the Class is believed to be so numerous that joinder of all members is impractical.

173.    Typicality of Claims (Rule 23(a)(3)): Plaintiffs' claims are typical of those of the Class because Plaintiffs, like all members of the Class, visited the Website and searched for medical- or otherwise sensitive health-related products, added the items to their cart and/or purchased the items on the Website.  Plaintiffs' and Class members' PHI was then disclosed and shared by Rite Aid to third parties.

174.    Adequacy of Representation (Rule 23(a)(4)): Plaintiffs will fairly and adequately represent and protect the interests of the Class.  Plaintiffs have no interests antagonistic to, nor in conflict with, the Class. Plaintiffs have retained competent counsel who are experienced in consumer and commercial class action litigation and who will prosecute this action vigorously.

175.    Superiority (Rule 23(b)(3)): A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the monetary damages suffered by individual Class Members is relatively small, the expense and burden of individual litigation make it impossible for individual Class Members to seek redress for the wrongful conduct asserted herein.  If Class treatment of these claims is not available, Defendant will likely continue

its wrongful conduct, will unjustly retain improperly obtained revenues, or will otherwise escape liability for its wrongdoing as asserted herein.

176.    Commonality and Predominance (Rule 23(a)(2), 23(b)(3)): There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual members of the Class include:

a.    Whether Rite Aid implemented the Tracking Entities' tools on the Website;

b.    Whether the Tracking Entities collected Plaintiffs' and the Class's PHI, Queries, and webpage interactions on the Website;

c.    Whether Rite Aid's disclosures of Plaintiff and Class Members' PHI was without consent or authorization;

d.    Whether Rite Aid unlawfully disclosed and continue to disclose the PHI, Queries, and webpage interactions of Tracked Users;

e.    Whether Rite Aid's omissions regarding the practices alleged herein constitute an unfair and/or deceptive practice; and

f.    Whether Rite Aid's disclosures were committed knowingly.

177.    Information concerning Rite Aid's Website data sharing practices and are available from Rite Aid's or third-party records.

178.    Plaintiffs know of no difficulty which will be encountered in the management of this litigation which would preclude its maintenance as a class action.

179.    The prosecution of separate actions by individual members of the Classes would run the risk of inconsistent or varying adjudications, and establish incompatible standards of conduct for Rite Aid.  Prosecution as a class action will eliminate the possibility of repetitious and inefficient litigation.

180.    Rite Aid has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

181.    Rite Aid has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

182.    Given that Rite Aid's conduct is ongoing, monetary damages are insufficient and there is no complete and adequate remedy at law.

## COUNT I

**VIOLATION OF THE PENNSYLVANIA'S WIRETAPPING AND ELECTRONIC SURVEILLANCE CONTROL ACT**
**18 Pa. C.S.A. § 5701, *et seq.***
**(On Behalf of the Classes)**

183.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

184.    Plaintiffs bring this claim individually and on behalf of the Class and Pennsylvania Subclass.

185.    The Pennsylvania Wiretapping and Electronic Surveillance Control Act ("WESCA") is codified at 18 Pa.C.S.A §§ 5701, *et seq*.

186.    18 Pa.C.S.A. § 5725 provides, in pertinent part, as follows:

(a) Any person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of this chapter shall have a civil cause of action against any person who intercepts, discloses or uses or procures any other person to intercept, disclose or use, such communication; and shall be entitled to recover from any such person: (1) Actual damages, but not less than liquidated damages computed at the rate of $100 a day for each day of violation, or $1,000, whichever is higher; (2) Punitive damages. (3) A reasonable attorney's fee and other litigation costs reasonably incurred.

187.    WESCA defines "electronic communication" as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a

wire, radio, electromagnetic, photoelectronic or photo-optical system, except: (1) [deleted], (2) [a]ny wire or oral communication, (3) [a]ny communication made through a tone-only paging device, or (4) [a]ny communication from a tracking device (as defined in this section)." 18 Pa.C.S.A. § 5702. It further defines "intercept" as "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device." *Id.*

188.    At all relevant times, Rite Aid disclosed and/or used Plaintiffs' and Class Members' PHI and procured, aided, employed, agreed with, and conspired with the Tracking Entities to intercept, disclose, and/or use Plaintiffs' and Class Members' internet communications while accessing https://www.riteaid.com, including the contents thereof; *i.e.*, the URL visited, the medical- or otherwise sensitive-related products browsed, added to cart and/or purchased on the Website, the types of medications site users were purchasing or using, as well as payment and delivery location associated with purchases. This information not only constitutes protected health or personal information, it also represents the nature and substance of the expected and anticipated communications between Plaintiffs and other Class Members with Rite Aid's Website.

189.    Plaintiffs and other Class Members had a reasonable expectation of privacy in the electronic communications they had with the Website.

190.    Unbeknownst to Plaintiffs and other Class Members, however, these electronic communications were transmitted to and intercepted by a third party (*i.e.,* Facebook and Google) during the communication.  This was done without knowledge, authorization, or consent of Plaintiffs and Class Members.

191.    Rite Aid intentionally inserted an electronic device or apparatus into the Website that recorded and transmitted the substance of users' confidential communications with Rite Aid to a third party.

192.    Rite Aid willingly procured and facilitated Tracking Entities' interception and collection of Plaintiffs' and Class Members' PHI by embedding the tracking tools on the Website.

193.    As a device or apparatus to intercept wire, electronic, or oral communications on the Website, Rite Aid used the following:

a.      Codes and programs Tracking Entities used to track Plaintiffs' and Class Members' communications while using the Website;

b.      Codes and programs Tracking Entities used to intercept Plaintiffs' and Class Members' communications while using the Website;

c.      Plaintiffs' and Class Members' browsers; and

d.      Plaintiffs' and Class Members' computers;

194.    Rite Aid failed to disclose that it used the tracking tools to track, automatically and simultaneously transmit communications to a third party; *i.e.,* Facebook and Google.

195.    All parties to the communications between Plaintiffs or Class Members and Rite Aid alleged herein have not given prior consent to such interception because Plaintiffs or Class Members, as parties to said communications, never gave such consent. See 18 Pa. C.S. § 5704(4).

196.    To avoid liability under the WESCA, a defendant must show it had the consent of all parties to a communication.

197.    The medical- or otherwise sensitive-related products browsed, added to cart and/or purchased on the Website, including the types of medications/health related or sensitive items site users were purchasing or using, constitutes protected health information.

198.    No legitimate commercial purpose was served by Rite Aid's willful and intentional disclosure of Plaintiffs' and Class Members' PHI to Facebook, Google, and other third parties. Neither Plaintiffs nor Class Members consented to the disclosure of their PHI by Rite Aid to Facebook, Google and other third parties. Nor could they have consented, given that Rite Aid

never sought Plaintiffs' or Class Members' consent, much less told visitors to its website that their every interaction was being recorded and transmitted to third parties via tracking tools.

199.    As alleged, Rite Aid violated WESCA by disclosing and using PHI without consent and by aiding and permitting third parties to receive their site users' online communications in real time through the Website without their consent.

200.    By disclosing Plaintiffs' and Class Members' PHI, Rite Aid violated Plaintiffs' and Class Members' statutorily protected privacy rights.

201.    Rite Aid has engaged in intentionally intercepting, endeavoring to intercept, or procuring other person(s) – at a minimum, Facebook and Google – to intercept or endeavor to intercept, the contents of alleged wire or electronic communications between Plaintiffs or Class Members and Rite Aid.

202.    In addition, or in the alternative, Rite Aid has engaged in intentionally disclosing or endeavoring to disclose to other person(s) – at a minimum, Facebook and Google – the contents of wire or electronic communications between Plaintiffs or Class Members and Rite Aid, even though Rite Aid knows, or at least has reason to know, that the information was obtained through the interception of wire or electronic communications between Plaintiffs or Class Members and Rite Aid.

203.    In addition, or in the alternative, Rite Aid has engaged in intentionally using or endeavoring to use the contents of wire or electronic communications between Plaintiffs or Class Members and Rite Aid, even though Rite Aid knows, or at least has reason to know, that the information was obtained through the interception of wire or electronic communications between Plaintiffs or Class Members and Rite Aid.

204.     As a result of the above violations and pursuant to 18 Pa.C.S.A § 5725(a), Plaintiff and Class members are entitled to actual damages or liquidated damages of $1,000 or $100 per day for each violation, whichever is higher.

205.     Under the statute, Rite Aid also are liable for reasonable attorneys' fees, reasonable litigation costs, injunctive and declaratory relief, and punitive damages in an amount to be determined by jury, but sufficient to prevent the same or similar conduct by the Rite Aid in the future.

## COUNT II

### BREACH OF IMPLIED CONTRACT
### (On Behalf of the Classes)

206.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

207.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Rite Aid.

208.     When Plaintiffs and Class Members provided their PHI to Rite Aid, they entered into an implied contract pursuant to which Rite Aid agreed to safeguard and not disclose their PHI without consent.

209.     Plaintiffs and Class Members would not have entrusted Rite Aid with their PHI in the absence of an implied contract between them and Rite Aid obligating Rite Aid to not disclose PHI without consent.

210.     Plaintiffs and Class Members would not have used the Website in the absence of an implied contract between them and Rite Aid obligating Rite Aid to not disclose PHI without consent.

211.     Rite Aid breached these implied contracts by disclosing Plaintiffs' and Class Members' PHI without consent to third parties like Google and Facebook.

212.     As a direct and proximate result of Rite Aid's breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein, including but not limited to the loss of the benefit of their bargain and diminution in value of PHI.

213.     Plaintiffs and Class Members are entitled to compensatory and consequential damages as a result of Rite Aid's 's breach of implied contract.

## COUNT III

**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Classes)**

214.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

215.     In light of the special relationship between Rite Aid and Plaintiffs and Class Members, whereby Rite Aid became a guardian of Plaintiffs' and Class Members' PHI, Rite Aid became a fiduciary by its undertaking and guardianship of the PHI, to act primarily for the benefit of their customers, including Plaintiffs and Class Members: (1) for the safeguarding of Plaintiffs' and Class Members' PHI; (2) to timely notify Plaintiffs and Class Members of disclosure of their PHI to unauthorized third parties; and (3) to maintain complete and accurate records of what Visitor information (and where) Rite Aid did and does store and disclose.

216.     Rite Aid had a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of this relationship, in particular, to keep private and not disclose the PHI of the Tracked Users.

217.     Rite Aid breached their fiduciary duties to Plaintiffs and Class Members by failing to keep their PHI confidential and by disclosing it to third parties.  Rite Aid breached its fiduciary duties owed to Plaintiffs and Class Members by failing to ensure the confidentiality and integrity of electronic PHI Rite Aid received, maintained, and transmitted, in violation of 45 C.F.R. § 164.306(a)(1).

218.    Rite Aid breached its fiduciary duties owed to Plaintiffs and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3).

219.    Rite Aid breached its fiduciary duties owed to Plaintiffs and Class Members by failing to ensure compliance with the HIPAA security standard rules by their workforce in violation of 45 C.F.R. § 164.306(a)(4).

220.    Rite Aid breached its fiduciary duties owed to Plaintiff and Class Members violation of 45 C.F.R. § 164.308(b) by failing to obtain satisfactory assurances, including in writing, that their business associates and/or subcontractors would appropriately safeguard Plaintiffs' and Class Members PHI.

221.    Rite Aid breached its fiduciary duties owed to Plaintiffs and Class Members by failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. § 164.312(a)(1).

222.    Rite Aid breached its fiduciary duties owed to Plaintiffs and Class Members by failing to implement technical security measures to guard against unauthorized access to electronic protected health information that is being transmitted over an electronic communications network in violation of 45 C.F.R. § 164.312(e)(1).

223.    Rite Aid breached its fiduciary duties owed to Plaintiffs and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons in violation of 45 C.F.R. § 164.502, *et seq*.

224.    Rite Aid breached its fiduciary duties to Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' PHI.

225.    As a direct and proximate result of Rite Aid's breach of its fiduciary duties, Plaintiffs and Class Members have suffered and will suffer injury, as described above.

## COUNT IV

**VIOLATIONS OF PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW, 73 P.S. §§ 201-1, et seq.**
**(On Behalf of Plaintiffs and the Pennsylvania Subclass)**

226.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

227.    This cause of action is brought pursuant the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), which Pennsylvania courts have invariably interpreted using the kind of liberal construction afforded to state consumer protection statutes intended to prevent fraud.

228.    Rite Aid' offer, provision, and sale of services at issue in this case constitute "trade" or "commerce" within the scope of the UTPACPL. See 73 P.S. § 201-2(3).

229.    Plaintiffs and Class Members, as "person[s]," are consumers within the protection of the UTPCPL. See 73 P.S. § 201-2(2).

230.    By serving as Plaintiffs' and Class Members' provider of health-related products, Rite Aid had a duty to protect their PHI from unlawful disclosure.

231.    Rite Aid engaged in the conduct alleged in this Class Action Complaint, entering into transactions intended to result, and which did result, in the provision of Plaintiffs and Class members searching for medical- or otherwise sensitive health-related products on the Website.

232.    Rite Aid's acts, practices, and omissions were done in the course of Rite Aid's offer of services throughout the Commonwealth of Pennsylvania and the United States.

233.    The unfair, unconscionable, and unlawful acts and practices of Rite Aid, alleged herein, and in particular the decisions regarding the implementation of the tracking tools on the

48

Website, emanated and arose within the Commonwealth of Pennsylvania, within the scope of the UTPCPL.

234.    Rite Aid, operating in and out of Pennsylvania, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of 73 P.S. § 201-2(4), including but not limited to the following: (a) knowingly and improperly storing, possessing, using, and/or procuring the interception of, Plaintiffs' and Class Members' PHI; and (b) knowingly disclosing Plaintiffs' and Class Members' PHI to third parties, including Facebook and Google.

235.    Rite Aid committed these acts while simultaneously representing that it would protect and not unlawfully disclose Plaintiffs' and Class Members' PHI, and while under a legal obligation to do so.

236.    These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including by not limited to HIPAA, statutes regarding the confidentiality of medical records, and the UTPCPL.

237.    Rite Aid knew or should have known that the Website and the cookies and source code thereon was unlawfully wiretapping, intercepting, and disclosing Plaintiffs' and Class Members' PHI.

238.    Plaintiffs have standing to pursue this claim because as a direct and proximate result of Rite Aid's violations of the UTPCPL, Plaintiffs and Class Members have been "aggrieved" by a violation of the UTPCPL and bring this action to obtain a declaratory judgment that Rite Aid's acts or practices violate the UTPCPL. See 73 P.S. § 201-9.2.

239.    Plaintiffs also have standing to pursue this claim because, as a direct result of Rite Aid's knowing violation of the UTPCPL, Plaintiffs and Class Members have lost money or

property in the form monies paid to Rite Aid, diminution in value of their PHI, as well as loss of the benefit of their bargain with Rite Aid.

240.     Plaintiffs and Class Members are entitled to injunctive relief to protect them from the loss of control of their PHI, including, but not limited to: (a) ordering that Rite Aid immediately remove any pixel, web beacon, cookie, or other tracking technology that causes the disclosure of PHI to third parties without consent or otherwise obtain valid consent from users for such data collection practices; (b) ordering that Rite Aid engage third-party security auditors and internal personnel to ensure Plaintiffs' and Class Members' PHI is no longer subject to the unlawful practices described in this Complaint; (c) ordering that Rite Aid purge, delete, and destroy PHI not necessary for their provisions of services in a reasonably secure manner; and (d) ordering that Rite Aid routinely and continually conduct internal training and education to inform internal security personnel how to properly handle PHI provided via the Website.

241.     Plaintiffs bring this action on behalf of themselves and Class Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiffs, Class Members, and the public from Rite Aid's unfair methods of competition and unfair, unconscionable, and unlawful practices. Rite Aid's wrongful conduct as alleged in this Class Action Complaint has had widespread impact on the public at large.

242.     The above unfair, unconscionable, and unlawful practices and acts by Rite Aid were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Class Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

243.     Rite Aid's actions and inactions in engaging in the unfair, unconscionable, and unlawful practices described herein were negligent, knowing and willful, and/or wanton and reckless.

244.     Plaintiffs and Class Members seek relief under the UTPCPL, 73 P.S. §§ 201-1, *et seq*., including, but not limited to, a declaratory judgment that Rite Aid's actions and/or practices violate the UTPCPL; injunctive relief enjoining Rite Aid, its employees, parents, subsidiaries, affiliates, executives, and agents from continuing to violate the UTPCPL as described above.

245.     Plaintiffs and Class Members are also entitled to recover actual damages, to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper.

## COUNT V

**INVASION OF PRIVACY**
**(On Behalf of Plaintiffs and the Classes)**

246.     Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

247.     Plaintiffs bring this claim individually and on behalf of the members of the proposed Class against Rite Aid.

248.     Plaintiffs and members of the Class had a legitimate and reasonable expectation of privacy regarding their PHI and were thus entitled to the protection of this information against disclosure to unauthorized third parties.

249.     Rite Aid owed a duty to Plaintiffs and Class Members to keep their PHI confidential.

250.     Rite Aid owed a duty to Plaintiffs and Class Members not to give publicity to their private lives to Facebook, Google, and, by extension, other third-party advertisers and business who purchased advertising services from either.

251. Rite Aid's willful and intentional disclosure of Plaintiffs and Class Members' PHI constitutes an intentional interference with their interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

252. Rite Aid's intentional physical or sensory intrusion on Plaintiffs' and Class Members' privacy because Rite Aid exceeded their authorization to share their information and facilitated Facebook's and Google's simultaneous eavesdropping and wiretapping of confidential information.

253. Rite Aid failed to protect Plaintiffs' and Class Members' PHI and acted knowingly when it installed Google's products and Facebook's Pixel onto their Website because the purpose of those tracking tools is to intercept, analyze, and disseminate individual's communications with the Website for the purpose of marketing and advertising.

254. Because Rite Aid intentionally and willfully incorporated the tracking entities' software into their Website and encouraged consumers to use that Website for, among other things, healthcare purposes, Rite Aid had notice and knew that their practices would injure Plaintiffs and Class Members.

255. As a proximate result of Rite Aid's acts and omissions, the private and sensitive PHI of Plaintiffs and the Class Members was disclosed to third parties without authorization, causing Plaintiffs and the Class to suffer damages.

256. This invasion of privacy constitutes an egregious breach of the social norms underlying the privacy right.

257. Plaintiffs, on behalf of themselves and Class Members, seek compensatory damages for Rite Aid's invasion of privacy, which includes the value of the privacy interest invaded by Rite Aid, loss of time and opportunity costs, plus prejudgment interest, and costs.

258.    Rite Aid's wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their PHI is continued to be shared by Rite Aid and still in the possession of Google, Facebook and other third parties and the wrongful disclosure of the information cannot be undone.

259.    Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Rite Aid's continued possession of their sensitive and confidential PHI, especially where a judgment for monetary damages alone will not undo Rite Aid's disclosure of the information to the tracking entities and the Tracking Entities' advertising purchasers, who on information and belief, continue to possess and utilize that information.

260.    Plaintiffs, on behalf of themselves and Class Members, further seek injunctive relief to enjoin Rite Aid from further intruding into the privacy and confidentiality of Plaintiffs' and Class Members' PHI and to adhere to their common law, contractual, statutory, and regulatory duties.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, seek judgment against Rite Aid, as follows:

(a)    For an order determining that this action is properly brought as a class action and certifying Plaintiffs as the representatives of the Classes and their counsel as Class Counsel;

(b)    For an order declaring that the Rite Aid's conduct violates the statutes referenced herein;

(c)    For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d)     Entry of an order for injunctive and declaratory relief as described herein, including, but not limited to, requiring Rite Aid to immediately (i) remove the tracking tools from the Website or (ii) add, and obtain, the appropriate consent from Tracked Users;

(e)     For damages in amounts to be determined by the Court and/or jury;

(f)     An award of statutory damages or penalties to the extent available;

(g)     For Rite Aid to pay $1,000.00 to Plaintiffs and members of the Class, as provided by WESCA, 18 Pa. C.S.A. § 5725;

(h)     For pre-judgment interest on all amounts awarded;

(i)     For an order of restitution and all other forms of monetary relief;

(j)     An award of all reasonable attorneys' fees and costs; and

(k)     Such other and further relief as the Court deems necessary and appropriate.

## DEMAND FOR TRIAL BY JURY

Plaintiffs demand a trial by jury of all issues so triable.

Dated: August 25, 2023

*/s/ Russell D. Paul*
Russell D. Paul, PA Bar No. 71220
Jacob M. Polakoff, PA Bar No. 204124
**BERGER MONTAGUE PC**
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
Email: rpaul@bm.net
Email: jpolakoff@bm.net

Mark S. Reich*
Courtney Maccarone*
**LEVI & KORSINSKY, LLP**
55 Broadway, 4th Floor, Suite 427
New York, NY 10006
Telephone: (212) 363-7500
Facsimile: (212) 363-7171

Email: mreich@zlk.com
Email: cmaccarone@zlk.com

*Counsel for Plaintiffs*

*\*pro hac vice* forthcoming